Filed 11/2/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re TYLER R., | B261136 |
| a Person Coming Under the Juvenile Court Law. | (Los Angeles County Super. Ct. No. DK06923) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| MARITZA M., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Carlos E. Vasquez, Judge.  Affirmed.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Tyson B. Nelson, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Maritza M. (Mother) appeals the juvenile court's jurisdictional findings and disposition orders declaring her son, Tyler R., to be a person described by Welfare and Institutions Code[1] section 300, subdivision (b), and removing Tyler from Mother's custody. On appeal, Mother contends the juvenile court's findings and orders are not supported by substantial evidence. She also contends the Los Angeles County Department of Children and Family Services (Department) did not make reasonable efforts to prevent or eliminate the need for Tyler's removal from her home. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Prefiling Investigation*

In late July 2014, the Department received a child abuse hotline referral regarding two-day-old Tyler. The caller reported Tyler's mother was severely disabled, in a wheelchair, and unable to care for herself or Tyler. The caller believed Mother was "gravely disabled," unable to speak or write and had no control over the movement of her limbs. The caller characterized Tyler's father, David R. (Father) as controlling and "dominant" with Mother.[2]

In response to the hotline referral, the Department dispatched a social worker to investigate. The social worker interviewed hospital staff and learned Tyler was born prematurely at 32 weeks, but he suffered no medical problems. Tyler was not scheduled to be released, however, for three to four weeks because he was having feeding problems.

The social worker made an unannounced visit to Mother and Father's home where she interviewed them separately. Father denied any domestic violence against Mother

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    Father is not a party to this appeal.

but told the social worker he was a "second striker" with arrests for assault with a deadly weapon and burglary. He also revealed he was on parole. Father said his life had changed with the birth of his son, and he would do everything for him. He reported that he and Mother were moving in with her grandmother and adult siblings so they would have family support and assistance.

The social worker interviewed Mother privately and asked her a series of "yes" and "no" questions. Mother communicated with the social worker by nodding her head. Mother denied any domestic violence or concerns regarding Father and expressed she would feel better moving in with her grandmother. Mother indicated she felt safe.

On August 10, while Tyler was still hospitalized, the Department received a second emergency response referral concerning Tyler. The report alleged domestic violence by Father against Mother. Mother's adult brother and sister, Karla, brought Mother to the police station and reported two to three times a week, Father would pick mother up out of her wheelchair, shake her and slap her face multiple times.[3] Mother confirmed this information and gestured to indicate Father had struck her once across the right side of her head. An emergency protective order was issued so Father could not live in or come to the home or have contact with Mother or Tyler.[4]

The following day, Mother's siblings told the social worker that after Mother and Father moved into Mother's grandmother's home, Father had "smack[ed]" Mother, put his hand over her mouth, cursed at her and called her "Retard," "moron" and "Bitch." Karla told the social worker "she would care for [Mother] and Tyler once he was discharged and the entire family would help each other out with meeting their needs."[5]

---

[3]     Mother is 26 years old, 4 feet 10 inches tall and weighs 100 pounds.

[4]     Because Father's conduct violated his parole, he was later arrested and returned to custody. When law enforcement escorted Father out of the home, he reportedly told one of Mother's brothers, "When I get custody of my kid[,] you will never see him again."

[5]     When the social worker spoke with Father about the allegations, he said he knew he had an anger management problem and was working to enroll in and attend a parent

Shortly thereafter, Tyler's doctor notified the Department Tyler had been "medically cleared" for release, but the persons responsible for his care would have to be taught how to feed him properly before he could leave the hospital. The doctor revealed that her "biggest concern" was Tyler's ongoing care since, in the doctor's view, Mother was unable to provide care for him. The Department placed a "hospital hold" on Tyler and placed him into protective custody.

Just prior to juvenile court involvement, the social worker made an unannounced visit to Mother's home. The social worker informed Mother a court hearing regarding Tyler was going to be held. The social worker asked Mother if she understood. Mother shook her head, "no." Mother was upset during the visit and was crying. She was crying because family members had taken her cell phone since she continued to text Father despite the terms of the emergency protective order.

## B. *The Petition and the Detention Hearing*

The Department filed a three-count section 300 petition on August 18, 2014 alleging Tyler was described by subdivisions (a) and (b) of that section. Father's alleged domestic violence against Mother, and risk of harm to Tyler because of it, served as the basis for two of the counts. (Counts a-1 and b-1.) The remaining count involved Mother and her physical limitations. The Department alleged: "The child Tyler[']s . . . mother . . . is unable to provide care and supervision of the child in that mother is severely disabled. The mother's inability to provide care and supervision of the child endangers the child's physical health and safety and places the child at risk of physical harm and danger." (Count b-2.)

At the detention hearing, through its detention report, the Department advised the juvenile court of what social workers learned during its pre-filing investigation and recommended Tyler be detained. The Department informed the court that "no relatives

education class and an anger management program because he wanted his family back. He agreed to comply with the emergency protective order and agreed Tyler should be under the protective custody of the Department.

4

have been identified as a possible placement resource on the child's behalf." The Department noted that "the family has refused to care for Tyler . . . and no other family has come forward to care for Tyler."

The juvenile court detained Tyler from Father and ordered him released to Mother on condition that she continue to reside in her grandmother's home with her adult siblings.[6] The court also issued a temporary restraining order protecting Mother and Tyler from Father and set a jurisdiction hearing.

## C. *The Jurisdiction Hearing*

The juvenile court conducted a jurisdiction hearing on October 20, 2014. At that time, the Department submitted into evidence its detention report, a jurisdiction/disposition report and a last minute information for the court. The juvenile court did not receive any other evidence and heard argument from the parties.

The jurisdiction/disposition report set forth statements from Mother, Father and Mother's family members concerning the allegations of domestic violence.[7] Mother communicated to the social worker that Father had hit and slapped her in the past causing bruising. She indicated that Father called her names and yelled at her. Mother also verified that Father had shaken her violently and put his hand over her mouth.

Father denied the allegations and admitted only that he had yelled at Mother and covered her mouth in an effort "to calm her down." Father explained that Mother "screams really, really loud." Father suggested the complaints were fabricated by

---

[6]     The order specified Tyler be released to Mother on condition that she reside in Tyler's maternal uncle's home. Mother and four adult siblings all resided in their grandmother's home, i.e., Tyler's maternal great grandmother's home.

[7]     As previously noted, Mother is not able to speak. To obtain information, the social worker would ask "yes" and "no" questions, and Mother would nod in response. Mother's family reported Mother "fully understands when someone is speaking with her."

5

Mother's siblings. Father told the social worker that Mother's siblings "possibly [did] not like him because they saw him stab someone in the face at a park years ago."

With regard to the allegations involving Mother, the social worker reported Mother "was unable to speak about her disability." She noted Mother's use of a wheelchair, the "hospital-like bed in her room" and the assistance she received from family members with her activities of daily living. The social worker "did not observe [M]other holding the baby or motion to hold the baby during the [one-and-a-half hour plus] visit in the home."

The report explained the unusual origin of Mother's physical issues. The social worker reported Mother had been hit by two cars in 2009 but "completely recuperated" and worked at Macy's after the accident. Two years later, however, "her condition deteriorated and she couldn't walk and lost her ability to speak."

The Department believed Mother's family demonstrated multiple strengths: family members were cooperative and supportive of one another; Mother had a stable home for herself and her baby, with extended family support for child care; Mother recognized her inability to care for Tyler and wanted Karla to be his legal guardian; Karla wanted to adopt Tyler if Mother could not care for him in the future; Mother was open to services and a medical assessment; and Tyler, who was then in Mother's legal custody, appeared to be healthy.

The Department, however, also had some concerns about Mother. "First and foremost" was Mother's inability to care for her infant son "due to her own physical handicap."

The Department also believed Mother was "very disconnected from the child. She rarely asks to hold the child and had to actually be encouraged to hold the child (with assistance from family) in order to bond with the child. Mother does not financially provide for the child, even though she receives over $900 in SSI per month.[8] The

---

8       Karla said Father had "used" Mother in the past and had access to her social security money. She said Mother also had a bank account but did not know how Mother

6

relatives in the home have provided the child with diapers, obtained WIC for the child, and have received donations from others. [Karla] takes the child to the doctor."

Finally, the Department had "serious concerns" about Mother's relationship with Father. Mother communicated to the social worker she missed Father and did not know if she still wanted to be in a relationship with him. Maternal relatives reported to the social worker Mother, in fact, wanted to be in a relationship with Father and was text messaging friends trying to obtain information about him.

Ultimately, the Department recommended through its jurisdiction/disposition report that Tyler be declared a dependent of the juvenile court and placed in Mother's care under the Department's supervision with family maintenance services. The Department's recommendation for leaving Tyler in Mother's custody was conditioned upon Mother being under the "care and supervision" of Karla or other relatives and that Tyler not be left alone with Mother.

The Department, however, changed its recommendation to the juvenile court through a last minute information to the court. The last minute information revealed that "[d]uring further investigation [the social worker] concluded that [M]other . . . is unable to meet minor Tyler['s] . . . basic needs. Therefore, the Department recommends the minor Tyler . . . be detained from [M]other . . . and be suitably placed with maternal aunt, Karla . . . ."

After admitting the Department's reports into evidence, counsel for the parties presented their arguments regarding the petition allegations. As to the allegation that Mother is "unable to provide care and supervision for the child [in] that she is severely disabled," counsel for the Department (joined by Tyler's counsel) asked the juvenile court to find "that [Mother] is severely disabled" and "due to [her] physical condition, that she's unable to provide care and supervision for [Tyler] . . . ."

---

accessed or used the money. (When the social worker first spoke with Father, he indicated he handled Mother's monthly disability income, and when the social worker asked Mother about her finances, she wanted to contact Father and did not know where her debit card was.)

7

In opposition, Mother's counsel argued the allegation based solely on Mother's disability was "not jurisdictional." Counsel asserted that notwithstanding Mother's physical disability, she had made an appropriate plan for Tyler's care with her family so there was no showing of "a nexus between mother's disability and her ability to care for the child."

After dismissing the subdivision (a) count and sustaining the subdivision (b) count of section 300, based on Father's violent conduct against Mother, the juvenile court sustained the petition count concerning Mother's inability to care for Tyler as well. The court stated: "I think that the counsel's arguments as to whether or not the mother is able to make an appropriate plan for the child—I think that is something that the court can take into consideration with respect to disposition," but "I do believe that the allegation is jurisdictional in this case because it is a situation where the mother is physically unable to tend to many of the needs of the child as pointed out by counsel. . . . Also if there were an emergency . . . , she's not in a position where she could get assistance for the child in certain situations."

The juvenile court further explained, "The court is looking as suggested by [Tyler's counsel] at the best interest of the child which that is the primary responsibility of the court . . . to ensure a child's safety and well-being. The court is happy that the mother is able to have the support of her family, but there is no guarantee that that . . . is going to continue to be available infinitely. Circumstances do change, and in the absence of that family support, this child's safety would be jeopardized."

The juvenile court heard briefly from the parties concerning disposition. The Department's counsel directed the court's attention to the Department's revised request to remove Tyler from Mother's care. Counsel for the Department explained suitable placement with Karla was appropriate "in light of" Mother's text messages indicating she missed Father, had tried to get information about him and was unsure whether she wanted to be in a relationship with him. The Department's counsel reported Father was due to be released from custody within the next month.

8

Mother's counsel stated she had intended to ask the juvenile court to continue the disposition hearing for the preparation of a guardianship report. Given the Department's change of placement recommendation, however, counsel asked to address the court. The juvenile court interjected: "I am not inclined to detain the child from the mother at this point."

Tyler's counsel addressed the court and expressed "concern[] about [the] mother's inclination to return to the father." The court reiterated: "I am not inclined to [remove from] the mother. However, if [she] exposes the child to any contact with the father in violation of the court's order, . . . then I will very promptly take action and remove that child from the mother."

The court continued the disposition hearing and then addressed Mother: "I am not going to detain [Tyler] from you as requested by the Department. . . . I think that you are clearly the victim of domestic violence. And I think that you need to give that some very, very serious thought [regarding] what you are going to do in the future because this is a very violent man that you are dealing with. And you being in the physical condition that you are in, you are very, very vulnerable to being seriously hurt if not killed. And it is my responsibility to ensure the well-being and safety of your child. If I get information that you are exposing this child to violence, either to yourself or to the child, that you are allowing the child to have contact with [his father] without an appropriate monitor, then you are going to have to make a choice between [him] and your child. . . . I cannot make it more clear to you than that. I am very sympathetic to you. Okay? I would like to keep this child with you, and I will do so if you conduct yourself in a way where you obey the court's orders and you do not expose this child to an unsafe dangerous situation. So do you understand that?"

In response to the juvenile court, Mother nodded affirmatively.

The court ordered Tyler to remain in Mother's custody pending disposition, but addressing Mother again, further ordered that Father "not have any unmonitored contact with [Tyler] . . . [a]nd you and he are not to be in the presence of the child together.

Okay?  So you [have] got some thinking to do, and I hope that you will give your future some serious thought.  Okay?"

## D. *The Disposition Hearing*

At the disposition hearing on December 3, 2014, the court received into evidence the Department's prior reports as well as an updated interim report.  In the new report, the Department continued to recommend suitable placement for Tyler.

The report provided that despite some issues with formula, four-and-a-half-month old Tyler "appeared well developed" and "well nourished."  Tyler was gaining about a pound a week and weighed 16 pounds.

The social worker, however, did not believe Mother was doing well.  According to the social worker, Mother "continues to get worse.  Her legs now do not bend at the knees—they stick out straight.  [She] almost slides off the small chair she sits on because she doesn't bend at the waist.  The only movement she makes is with her left hand to text people."

The Department had concerns Mother was not providing any financial support for Tyler,[9] had not bonded with Tyler and seemed too interested in maintaining her relationship with Father.[10]  The Department now believed the family home posed "a safety risk" to Tyler because there were bags of clothes on the floor, broken tiles and cockroaches.

In addition to the Department's reports, the juvenile court received testimony from Karla at the disposition hearing.  Karla testified that Mother did not care for Tyler on a daily basis and Mother had never asked Karla to care for him.  She also testified that

---

[9]     The Department was particularly concerned about the financial arrangements for Tyler.  There was some question about whether Mother's family had the ability to pay for certain medicine that had been prescribed for Tyler.  Karla indicated Tyler had received all medicine that had been prescribed for him.  She also stated she could meet Tyler's financial needs without assistance from Mother or the Department.

[10]     By the time of the disposition hearing, Father had been released from custody.

Mother did not give her any money for Tyler's necessities. Karla testified she was "definitely" committed to continuing to care for Tyler without any financial assistance. Karla was not aware of Father ever coming by the house in the time Tyler had lived with her, but if he ever did, she would call the police "immediately."

Karla testified she had never seen Mother physically or emotionally harm Tyler or do anything that placed Tyler's safety at risk, and she was not afraid that Mother would do so. Mother had never done anything to prevent Karla from taking care of Tyler, and Karla believed she was "definitely" able to keep him safe in her care. Although she would prefer to move out with Tyler to a new residence, if the court ordered him to remain with Mother, Karla testified she would remain there with him. She testified: "[I]f Tyler stays, I will stay." Asked whether her sister had given her permission to care for Tyler, Karla said, "Well, she never asked me to. I just took the responsibility."

Mother's counsel told the juvenile court Mother was sending her text messages throughout the disposition hearing indicating she wanted Karla to become Tyler's guardian. Mother's counsel asked the court to allow Tyler to remain in Mother's home and explore the possibility of a guardianship for Tyler.

At the conclusion of the hearing, the juvenile court removed Tyler from Mother and Father's custody and ordered him suitably placed with Karla. The juvenile court stated its decision was not based on Mother's physical inability to care for Tyler but rather on her "unwillingness to do her part to care for the child." Relying on the Department's interim report, the juvenile court explained Mother had "refused to provide for [Tyler] during the entire time that the child has been in her care. [She] won't pay for the diapers that he needs. She won't pay for the food that he eats. The report indicates . . . [M]other has demonstrated a lack of interest in the child . . . ." Further, the "desire" Mother had expressed to be with Father "does present a safety risk to the child."

The juvenile court commended Karla for "tak[ing] good care" of Tyler and said she had "done everything to ensure [he] is safe. However, a home of parent mother order would give [Karla] absolutely no rights to—over the care and control of this child. [Mother] would ultimately be the decision maker as to where the child goes. If she were

11

to decide to go back with the father, there is nothing [Karla] could legally do to prevent that, and so the court does believe that the Department has met its burden of clear and convincing evidence to remove from the mother at this time."

The court further ordered Mother could continue to reside with Karla and have unlimited monitored visitation. Mother's counsel objected to the requirement that visits be monitored, given the existing living arrangements and the fact she was not caring for Tyler on her own or taking him anywhere. The juvenile court responded: "My concern is not that she would harm the child intentionally in any way. There is absolutely no evidence of that. The concern is that some event could take place while she's alone with the child, and being in the physical condition that she is, she would not be able to remove the child or protect the child from whatever hazard happens to be present."[11]

## DISCUSSION

### A. *Mother's Contentions*

Mother argues the juvenile court's jurisdictional findings and disposition orders are not supported by substantial evidence. She also contends the Department failed to make reasonable efforts to prevent or eliminate the need to remove Tyler from her custody.

### B. *The Merits of Mother's Appeal Should Be Addressed*

The Department asserts we need not address Mother's appeal of the juvenile court's jurisdictional finding because the juvenile court properly obtained jurisdiction over Tyler based on the unchallenged allegations related to Father. Both parties recognize that "a jurisdictional finding good against one parent is good against both.

---

[11] At the disposition hearing, the juvenile court also granted Mother's request for a restraining order against Father protecting both Mother and Tyler until December 3, 2017.

12

More accurately, the minor is a dependent if the actions of either parent bring [him or] her within one of the statutory definitions of a dependent. [Citations.] This accords with the purpose of a dependency proceeding, which is to protect the child, rather than prosecute the parent. [Citation.]" (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397; accord, *In re I.A.* (2011) 201 Cal.App.4th 1484, 1491-1492.) Accordingly, the findings relating to Father (count b-1) provide sufficient grounds for affirming the declaration of dependency as to Tyler. (See *In re I.A.*, *supra*, at p. 1491 ["[a]s a result of this focus on the child, it is necessary only for the court to find that one parent's conduct has created circumstances triggering § 300 for the court to assert jurisdiction over the child"]; *In re P.A.* (2007) 155 Cal.App.4th 1197, 1212.)

Nonetheless, we recognize the outcome here "may have far-reaching implications with respect to future dependency proceedings in this case and [Mother's] parental rights." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 763.) We therefore agree with Mother's argument that we should reach the merits of the challenged jurisdictional findings relating to her as those findings may have adverse consequences in this or subsequent proceedings: "[W]e generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation]." (*Id.* at pp. 762-763.)

## C. *Standard of Review*

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.]

13

"We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.]"'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)  "Thus, we do not consider whether there is evidence from which the dependency court could have drawn a different conclusion but whether there is substantial evidence to support the conclusion that the court did draw." (*In re Noe F.* (2013) 213 Cal.App.4th 358, 366.)

## D. *Applicable Law—Jurisdiction*

Through the dependency law, the Legislature intended "to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.)  "Fundamentally, . . . the focus of the system is on the child, not the parents." (*D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1129.)

A child may be declared a dependent of the juvenile court when that child is described by any one of the 10 subdivisions of section 300.  Section 300 also specifically instructs that where a parent suffers from a physical disability "the court's determination pursuant to this section shall center [on] whether a parent's disability prevents him or her from exercising care and control." (§ 300, subd. (j), ¶ 2.)  This physical disability provision is not set forth as a separate basis for dependency jurisdiction.  Instead, it appears in a paragraph of the statute setting forth legislative intent including a declaration that "physical disability . . . is no bar to the raising of happy and well-adjusted children." (*Ibid.*)

Courts have consistently summarized lengthy subdivision (b)(1) of section 300 as requiring "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820; accord, *In re David M.* (2005) 134 Cal.App.4th 822, 829.)  While this much-used shorthand

description is helpful, reference to the actual statute details "the specified forms" or grounds for dependency jurisdiction in the subdivision. (*Ibid*.)

More specifically, a child is described by section 300, subdivision (b)(1), where the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness," resulting from any of the following: (1) "the failure or inability of his or her parent . . . to adequately supervise or protect the child"; (2) "the willful or negligent failure of the child's parent . . . to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left"; (3) "the willful or negligent failure of the parent . . . to provide the child with adequate food, clothing, shelter, or medical treatment"; or (4) "the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse." (*Ibid.*)

A substantial risk of harm to a child as a result of the inability of a parent to adequately supervise or protect that child is a basis for dependency jurisdiction without regard to any willful or negligent conduct of a parent. The first clause of subdivision (b)(1) of section 300 requires nothing more.[12] Dependency jurisdiction under such circumstances promotes the overall policy of the dependency law "to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.)

The notion that a child may be subject to dependency jurisdiction without parental fault or blame is consistent with at least two other situations under section 300. A child who "'is suffering serious emotional damage, or is at a substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others . . . who has no parent . . . capable of

---

[12]   "'The statute's plain meaning controls the court's interpretation unless its words are ambiguous. If the plain language of a statute is unambiguous, no court need, or should, go beyond that pure expression of legislative intent.'" (*Ruiz v. Sylva* (2002) 102 Cal.App.4th 199, 209, quoting *Kobzoff v. Los Angeles County Harbor/UCLA Medical Center* (1998) 19 Cal.4th 851, 861.)

15

providing appropriate care" is described by section 300, subdivision (c). (*In re Alexander K.* (1993) 14 Cal.App.4th 549, 557.) Subdivision (c) of section 300 does not require parental fault or neglect. Instead, dependency jurisdiction may be established where a parent is unable, for whatever reason, to provide adequate mental health treatment. (*In re Alexander K.*, *supra*, at p. 557.)[13]

Similarly, subdivision (g) of section 300 permits dependency jurisdiction where a parent has left the child with a relative or other custodian and that caregiver "is unwilling or unable to provide care or support for the child." This provision in subdivision (g) does not require willfulness or bad faith on behalf of a parent. (*D.M. v. Superior Court*, *supra*, 173 Cal.App.4th at pp. 1128-1129.) Section 300, subdivision (g), also supports dependency jurisdiction where an incarcerated parent "cannot arrange for the care of the child." The focus is on the parent's inability to arrange care without regard to fault or blame. (*In re Aaron S.* (1991) 228 Cal.App.3d 202, 208 ["[a]ccordingly, [§] 300, [subd.] (g) applies when, at the time of the hearing, a parent has been incarcerated and does not know how to make, or is physically or mentally incapable of making, preparations or plans for the care of his or her child"].)

Moreover, the Legislature's express directive that in the case of a parent with a physical disability the juvenile court must consider "whether a parent's disability prevents him or her from exercising care and control" (§ 300, subd. (j), ¶ 2) is consistent with the notion that dependency jurisdiction need not necessarily be supported by some willful or negligent conduct of the parent. If a parent is physically unable to exercise care and control of his or her child such that the child is at substantial risk of harm, the parent's inability (without regard to fault or blame) to adequately supervise or protect the child would support dependency jurisdiction under the first clause of section 300, subdivision (b)(1).

---

[13]     Like section 300, subdivision (b)(1), in addition to allowing jurisdiction without regard to the fault of a parent, subdivision (c) includes an alternative jurisdictional basis based on a parent's action or inaction in relation to the mental health of the child.

We do not suggest that the fact of a severe disability alone "ipso facto make[s] a parent unfit" or that dependency jurisdiction can simply be based on a "label." Instead, dependency jurisdiction depends upon an evaluation of the extent of the disability and how the disability impacts, if at all, a parent's ability to adequately supervise and protect his or her child. If the parent's abilities are compromised to such an extent that a child in the parent's care and control would be at substantial risk of harm, dependency jurisdiction is warranted "to ensure the safety, protection, and physical and emotional well-being" of that child. (§ 300.2.)

We recognize that the notion of dependency jurisdiction without regard to parental fault or blame is at odds with our Division One colleagues' decision in *In re Precious D.* (2010) 189 Cal.App.4th 1251 (*Precious D.*).[14] Nonetheless, we respectfully disagree with the conclusion that section 300, subdivision (b)(1), necessarily requires that "parental unfitness or neglectful conduct must be shown in order to assert dependency court jurisdiction under that part of section 300[, subdivision] (b)." (*Precious D.*, *supra*, at p. 1254; see *Jessen v. Mentor Corp.* (2008) 158 Cal.App.4th 1480, 1489, fn. 10 [one division of the Second District is not bound by the decision of another division; there is no horizontal *stare decisis*].)

*Precious D.* addressed dependency jurisdiction in the context of an incorrigible teenager. In reaching its conclusion that parental unfitness or neglectful conduct was required for dependency jurisdiction under subdivision (b) of section 300, *Precious D.* considered the overall statutory scheme governing dependency. The court reasoned if "dependency jurisdiction [could] be asserted over an incorrigible child whose parent is neither unfit nor neglectful," and ultimately parental rights could be terminated, federal due process principles would be compromised. (*Precious D.*, *supra*, 189 Cal.App.4th at p. 1261.) The court expressed concern that a jurisdictional finding where the parent was

---

14      Our colleagues in Division Two recently disagreed with *Precious D.* as well in *In re R.T.* (2015) 235 Cal.App.4th 795, a decision in which the Supreme Court granted review on June 15, 2015, S226416.

17

not at fault "would then be the basis for the child's removal and for an order requiring reunification services that are either unnecessary or doomed to failure . . . ." (*Ibid.*)

We do not share those same concerns, based on the California Supreme Court's explanation of the statutory scheme in *Cythnia D. v. Superior Court* (1993) 5 Cal.4th 242. "By the time termination [of parental rights] is possible under our dependency statutes the danger to the child from parental unfitness is so well established that there is no longer 'reason to believe that positive, nurturing parent-child relationships exist' [citation], and the *parens patriae* interest of the state favoring preservation rather than severance of natural familial bonds has been extinguished." (*Id.* at p. 256.) "Indeed, our scheme requires: (1) a court finding that 'there is substantial risk of serious future injury' to the minor in order to establish dependency [citation]; (2) a finding by clear and convincing evidence that there is 'substantial danger to the physical health of the minor' in order to remove the child from parental custody [citation]; and (3) repeated findings by a preponderance of the evidence that return 'would create a substantial risk of detriment to the physical or emotional well-being of the minor' [citations]." (*Id.* at pp. 254-255.)

Therefore, we hold that dependency jurisdiction may be established under the first clause of section 300, subdivision (b)(1)—"the failure or inability of his or her parent . . . to adequately supervise or protect the child"—without regard to parental fault or blame. In cases involving the physical disability of a parent the juvenile court must also focus "upon whether a parent's disability prevents him or her from exercising care and control." (§ 300, subd. (j), ¶ 2.) Thus, where a parent's physical disability makes him or her unable to exercise care and control of his or her child such that the parent cannot adequately supervise and protect the child resulting in a substantial risk of harm to that child, the juvenile court's jurisdiction may be invoked under the first clause of section 300, subdivision (b)(1).

### E. *Substantial Evidence Supports the Jurisdictional Finding as to Mother*

Relying on the first clause in section 300, subdivision (b)(1), the petition allegations concerning Mother are minimal: "The child Tyler['s] mother . . . is unable to

provide care and supervision of the child in that the mother is severely disabled. The mother's inability to provide care and supervision of the child endangers the child's physical health and safety and places the child at risk of physical harm and damage." The allegations are based solely on Mother's physical disability and her inability to provide care and support for Tyler.

The evidence before the juvenile court established Mother had significant physical limitations. She had very little control over her limbs, could not speak, used a wheelchair and relied on others to meet all of her activities of daily living. Mother did have some movement and control in her left hand and was able to communicate by way of text messages through a cell phone. There was no question that Mother did not have the physical ability to care for Tyler.

Moreover, the evidence before the juvenile court also set forth specific social worker concerns about Mother and her unwillingness to parent Tyler to the extent she was able. Mother showed a lack of interest in Tyler. Mother also did not ask others to assist her with holding him and did not provide Tyler with the necessities of life (formula, diapers, clothes, a crib). Mother relied on relatives to provide for Tyler financially despite her receipt of monthly disability income. Additionally, despite having been victimized by Father, Mother desired to continue her relationship with him. At the jurisdiction hearing, this evidence was unrefuted.

In addition to Mother's physical inability to supervise and protect Tyler, Mother was not actually "exercising care and control" over him. (§ 300.) She was not parenting him in any respect. There was no evidence before the juvenile court Mother made any parenting-related decisions for Tyler or directed others concerning his ongoing care.

Mother argues that while she may have been physically unable to provide care for Tyler, she "was able to provide for the child by having . . . those tasks done by one or more others [*sic*] who were physically able to provide that care and were willing to do so." Arguing by analogy to the law governing incarcerated parents, Mother contends her physical inability to parent Tyler does not support dependency jurisdiction where she has made an appropriate plan for his care. (See *Maggie S. v. Superior Court* (2013) 220

19

Cal.App.4th 662, 672; *In re Noe F.*, *supra*, 213 Cal.App.4th at p. 366 [no basis for jurisdiction where incarcerated parent makes appropriate plan for child].) Mother therefore relies on her family members' willingness to provide care for Tyler to undermine the juvenile court's jurisdictional findings.

We are not persuaded by Mother's argument. The Legislature has expressly provided that arranging for the care of a child is *the* relevant inquiry for dependency jurisdiction based solely upon a parent's incarceration. (§ 300, subd. (g).) The Legislature has ensured that "[t]here is no 'Go to jail, lose your child' rule in California. [Citation.]" (*In re S. D.* (2002) 99 Cal.App.4th 1068, 1077.)

In contrast to the express provision in section 300, subdivision (g), nothing in the first clause of section 300, subdivision (b)(1), suggests an appropriate plan for a child defeats dependency jurisdiction based on a parent's inability to supervise or protect the child.[15] "When language is included in one portion of a statute, its omission from a different portion addressing a similar subject suggests that the omission was purposeful." (*In re Ethan C.* (2012) 54 Cal.4th 610, 638.)

Substantial evidence supports the juvenile court's jurisdictional finding as to Mother. Mother's "severe disability d[id] not ipso facto" establish Tyler was a person described by section 300. Instead, after considering the evidence, the juvenile court determined Mother's physical inability to adequately supervise and protect Tyler along with her apparent lack of interest or indifference in parenting him as well as her failure to provide any care and control over Tyler put Tyler at substantial risk of harm because of his young age. The fortuity of Tyler having been well cared for by family members up to this point, in spite of Mother's physical inability to adequately supervise and protect him, does not preclude dependency jurisdiction.

---

[15] We agree with the juvenile court that an appropriate plan for a child's ongoing care is a relevant inquiry on the issue of disposition where the jurisdiction finding is based on a parent's inability to adequately supervise or protect the child.

20

**F.** *Substantial Evidence Supports the Juvenile Court's Disposition Orders and Finding of Reasonable Efforts*

After a juvenile court finds a child before it is described by section 300, the juvenile court "shall hear evidence on the question of the proper disposition to be made of the child." (§ 358, subd. (a).) The juvenile court may declare the child dependent and make orders concerning the child's custody. (§ 360, subd. (d); Cal. Rules of Court, rule 5.695.) The juvenile court may not remove physical custody of a child from his or her parent "unless the juvenile court finds clear and convincing evidence" "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).)

At the time the juvenile court made its disposition order removing Tyler from Mother's custody and ordering him suitably placed with Karla, the juvenile court clarified its disposition order was "not at all based upon the mother's inability to care for the child physically." Instead, the juvenile court articulated a number of findings that supported removal by clear and convincing evidence. Those specific findings as well as all of the other evidence before it supports the juvenile court's determination that there was a substantial danger to the physical health and safety of then four-and-a-half month old Tyler if he were left in Mother's care, and that reasonable efforts had been made to prevent or eliminate the need for removal.

The juvenile court found Mother was unwilling "to do her part to care for [Tyler]" and that she lacked interest in him. It also noted Mother refused to pay for food or diapers for Tyler and had never provided any financial assistance for him. The juvenile court was "troubl[ed]" by Mother indicating to a social worker that she intended to be

21

with Father when he was released from custody despite the physical abuse he inflicted upon her.[16]

The juvenile court's disposition order was supported by substantial evidence. The evidence before the juvenile court established Mother had abandoned any kind of parental role over Tyler. Despite her physical limitations, Mother had the ability to make parenting decisions for Tyler. Nothing prevented her from directing Tyler's care with physical assistance from others. Mother, however, did not assume any care and control of Tyler.

Additionally, the juvenile court recognized Mother's desire to reunite with Father represented a substantial risk of harm to Tyler. The juvenile court noted its concern that if Mother chose to "go back with Father," nothing would prevent her from taking Tyler with her. Given Mother's physical limitations, Father's history of significant violence against Mother and Tyler's young age, the juvenile court's concern was well justified.

We also find Mother's argument that the juvenile court should have dismissed the petition in favor of a guardianship granted by the probate court unavailing. Mother's counsel suggested if the case "were to close, . . . the mother could speak with the aunt and discuss issues about guardianship" and that the parties could go to probate court to obtain a guardianship. Discussing issues about guardianship, however, is nothing more than an idea and would not have ensured Tyler's safety.

Moreover, as correctly noted by the Department, there was no evidence that Father was in agreement with such an idea or that Father was not interested in reunifying with Tyler. In fact, there was some evidence to the contrary.

We also reject Mother's challenge to the juvenile court's finding at the disposition hearing that the Department made reasonable efforts to prevent or eliminate the need for

---

16 In fact, the juvenile court admonished Mother at the conclusion of the jurisdiction hearing that it believed Father was a "very violent man" and it was concerned that Mother's physical condition left her "very, very vulnerable to being seriously hurt if not killed."

Tyler's removal from Mother's custody as required by section 361, subdivision (c)(1). Mother claims the Department failed to provide her with any services while the disposition hearing was pending.

The evidence, however, is to the contrary and supports the juvenile court's finding of reasonable efforts. The Department initially left Tyler in Mother's home and worked with her so that she could retain custody of Tyler. Prior to the jurisdiction hearing, the Department conducted a team meeting with Mother and family members to create a plan to assist Mother with caring for Tyler. In the meeting, the Department and the family identified Tyler's need to bond to Mother. They also noted that Tyler's care would be the responsibility of Mother with the help and support of family. The team created a goal of Mother obtaining a proper medical diagnosis and medical care with the assistance of one of Mother's brothers.

Having participated in the meeting where goals for her were created, Mother was well aware of what was expected of her to ensure Tyler's safety. That Mother chose not to follow through with any of those goals cannot be blamed on an alleged failure to provide her with reasonable services to prevent or eliminate the need for Tyler's removal from her home.

## DISPOSITION

The orders are affirmed.

BECKLOFF, J.[*]

We concur:

PERLUSS, P. J.

SEGAL, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

24